392 F.2d 83
 Ronald G. WOLIN, Individually and on Behalf of Veterans and Reservists to End the War in Veitnam and the Fifth Avenue Vietnam Peace Parade Committee, Plaintiff-Appellee-Cross-Appellant,
v.
PORT OF NEW YORK AUTHORITY, Albert Rubbert, Manager of the Port Authority Bus Terminal, Captain Robert Friend, Commanding Officer of Port Authority Terminal Police, Lieutenant James Pettis, Lieutenant Fred Rackowski, Lieutenant Hugo Serrati, Lieutenant Anthony Unetich and Lieutenant George Gaulrapp, Officers of the Port Authority Terminal Police, Defendants-Appellants.
 No. 251.
 Docket 31715.
 United States Court of Appeals Second Circuit.
 Argued January 8, 1968.
 Decided March 1, 1968.
 
 Bradley R. Brewer, New York City (Eugene G. Eisner, David Fitzpatrick, Henry di Suvero, New York City, New York Civil Liberties Union, on the brief), for plaintiff-appellee-cross-appellant.
 Patrick J. Falvey, New York City (Sidney Goldstein, Arthur M. Schneider, New York City, on the brief), for defendants-appellants.
 Before SMITH, KAUFMAN and HAYS, Circuit Judges.
 IRVING R. KAUFMAN, Circuit Judge:
 
 
 1
 Ronald Wolin and the organizations he represents[1] have brought before this court questions that are significant and perplexing. We set them forth seriatim. May the Port of New York Authority[2] bar the use of its Terminal to all exercise of First Amendment rights? Are the peaceful activities proposed by the plaintiff, including distribution of leaflets, carrying placards, setting up card tables and conducting discussions with passers-by entitled to substantial protection under the First and Fourteenth Amendments? Are the plaintiff and his associates, who have promised to withdraw and discontinue these activities in the event of a disturbance, entitled to official protection against disturbances provoked by a hostile audience? These questions have been tactfully and carefully framed for us by the parties who appear here in confrontation after a constitutional pas de deux. Some fifteen months have passed since the plaintiff first sought to exercise his asserted right of protest.
 
 
 2
 We hold that the Port Authority may not abridge by absolute prohibition the right of political expression. The peaceful activities proposed by Wolin are protected against denial by the Port Authority, and accordingly, they may be restricted only by regulations narrowly drawn to serve legitimate interests of the general public who use the Terminal. We therefore affirm the judgment of the District Court, with modifications as set forth.
 
 I.
 
 3
 During the latter part of 1966, Ronald Wolin and others associated with the Fifth Avenue Vietnam Peace Parade Committee and the Veterans and Reservists to End the War in Vietnam assembled outside an entrance to the Bus Terminal building operated by the Port of New York Authority at Eighth Avenue and 40th Street, Manhattan. They came there for the purpose of distributing literature to persons on the sidewalk and occasionally engaging in conversation with persons in the area. These activities, designed to publicize the views of the group concerning the Vietnam war, were at all times conducted in a peaceful and orderly manner.
 
 
 4
 The Port of New York Authority is a public corporation created in 1921 by agreement between the States of New York and New Jersey. McKinney's Unconsolidated Laws of N.Y., §§ 6401, 6404. The Bus Terminal building operated by the Port Authority occupies a full city block in Manhattan. Thousands of persons use the terminal facilities, entering from the subway or through six outside entrances, using the fifty foot wide main concourse and four other levels to get to and from buses, subways, city streets, shops and other concessions. In 1966 the average number of persons passing through the building each day approximated 205,000 and on December 24, 1966 some 325,000 people used the facility. The Terminal contains, in addition to the open concourse areas and waiting rooms, bus line ticket counters, newsstands, restaurants, snack bars, a bakery, a drugstore, a bar, a bowling alley, a bank, gift shops and various other shops and concessions which are open to the general public. The defendant Albert Rubbert is the manager of the Terminal with general supervisory responsibility for its operations. The Port Authority maintains its own police force of 38 men who are charged with maintaining order and patrolling the terminal; the defendant Captain Robert Friend is the head of this contingent of the Port Authority police, and the other named defendants are officers assigned to duty in the terminal.[3]
 
 
 5
 In early November, 1966 Wolin and his group decided to take their protest inside the terminal where they might find in greater numbers than on the sidewalks their particular audience, traveling servicemen. Accordingly, with five others, Wolin entered the terminal on the evening of November 6 and distributed leaflets in the area near gates 108-115 on the upper bus level for approximately 80 minutes. Although it is agreed that their conduct was peaceful and did not cause any interference with the traffic in the Terminal, they were nevertheless approached by Lieutenant Serrati who requested their names. The six individuals refused to comply with Serrati's request and after some discussion, he threatened to arrest them if they refused to disband and leave the building. During this discussion, the police officer stated that the protesters were on "private" property, and demanded to know if they were there for the purpose of buying a ticket or travel by bus. The plaintiff and his associates replied that they were exercising their right of free speech by distributing the leaflets.
 
 
 6
 In this brief confrontation the pattern for the future encounters was set. On November 13, plaintiff entered the building with two others, and distributed handbills for about thirty minutes before they were asked to leave by Lieutenant Gaulrapp. Next, on November 16, 1966, plaintiff wrote to defendant Rubbert, the Manager of the Terminal, to request permission "to conduct free speech activities in the public areas of the Port Authority Bus Terminal"; in particular to distribute political handbills, to carry placards, to use card tables for the distribution of literature, to engage in discussions with others. Wolin proposed to conduct these activities every Sunday evening, and, in addition, on Wednesday evening, November 23, Friday evening, December 23 between 6 p. m. and 11 p. m. and Saturday, December 24, 1966 between 11 a. m. and 11 p. m. The nature of the proposed protest activity was evident from the letter:
 
 
 7
 The purpose of the activities covered by this request will be to communicate our views concerning the Vietnam war to traveling servicemen and to members of the public within the terminal and to persuade them to join our cause.
 
 
 8
 We do not intend to interfere in any significant or substantial way with the operation and use of the terminal for the convenience of bus passengers or other persons who may be passing through or waiting in the building. * * *
 
 
 9
 We intend to conduct our activities inside the terminal because this is the most effective — and perhaps the only effective — way to achieve our purpose. * * *
 
 
 10
 We do not intend to be in any way riotous, tumultuous, violent, threatening, intimidating, abusive, obscene, or insulting; nor do we intend to incite, provoke, or encourage any such behavior by anyone else. * * * If a situation should arise which the Terminal police cannot control, we shall temporarily cease our activities until such situation no longer exists. We intend to obey any police order reasonably designed to prevent serious disorder or blockage of pedestrian traffic.
 
 
 11
 Action leading to this lawsuit soon followed. On November 17, 1966, Rubbert denied the plaintiff's request, relying on the regulations governing use of the Terminal facility and the consistent policy of the Port Authority to deny permission to groups interested in conducting demonstrations or distributing leaflets in the building.[4] The Manager threatened arrest if the plaintiff persisted in his desire to protest within the Terminal.
 
 
 12
 Wolin then brought this action in the Southern District, seeking a declaratory judgment that he be permitted to distribute leaflets and to conduct other enumerated activities in the main concourse and passageways of the Terminal. Plaintiff also asked that the defendants be enjoined from restraining such activities, or arresting those persons exercising their rights of protest, or requiring him to obtain permission to engage in these activities, or in any way discouraging the public from accepting the leaflets, or harassing and interfering with the peaceful and orderly conduct of the plaintiff. Jurisdiction was based on 42 U.S.C. § 1983, 28 U.S.C. § § 1331, 1343 and 2201 and the First and Fourteenth Amendments to the United States Constitution.
 
 
 13
 Eventually, both parties moved for summary judgment. Judge Mansfield, in a carefully reasoned opinion,[5] granted the plaintiff's motion to the extent of finding that the Terminal area was dedicated to public use as a thoroughfare and that it was therefore an appropriate place for the exercise of rights protected by the First Amendment. He decided that plaintiff had a right to distribute the leaflets and this right could only be restricted under reasonable, limited, and clear regulations promulgated by the Authority. Accordingly, the court declared four sections of the Rules and Regulations unconstitutional and enjoined defendants from interfering with the plaintiff's right to distribute leaflets in a manner that would not unduly obstruct traffic in the terminal. He directed the Port Authority to promulgate new regulations that met standards of uniformity and specificity, to govern distribution of leaflets as well as the other methods of communication proposed by the plaintiff. The Port Authority appealed, challenging this order in its entirety and arguing that the terminal is an inappropriate place for political expression. The defendants contend that the absolute proscription of such activity embodied in present policy is proper and lawful. In response, the plaintiff has cross-appealed contending first, that the order failed to include a direction that defendants protect plaintiff in the exercise of his rights of protest against harassment from others; second, that the order should include similar protection pending the promulgation of regulations for activities other than the distribution of leaflets but no less protected by the Constitution; third, that the court should have declared the plaintiff's rights irreparably violated by the defendants' past conduct; fourth, that it was error to declare the regulations void only insofar as they involved censorship of protected expression; fifth, that any requirement of prior permission for the activities involved here should be declared invalid. In part the plaintiff's claims are concerned with the phrasing of the terms of the order; in part, as will appear, the cross-appeal points up important issues that were unresolved by the District Court, and which require some modification of the order.
 
 II.
 
 14
 The Port Authority in applying its Rules and Regulations has consistently denied access to its facility to those seeking to use the premises as a forum for expression. The ultimate question before us is whether these policies and regulations "deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." Cox v. State of New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). To make this determination we must first decide whether the terminal so resembles a public thoroughfare to make it an appropriate place for the exercise of First Amendment rights. Once the threshold to First Amendment analysis is crossed, we must determine whether the various methods proposed by the plaintiff to communicate his views are entitled to substantial protection under the First and Fourteenth Amendments so that plenary prohibition is impermissible and any regulation should be subjected to the scrutiny and judged by standards of precision applied to restrictions of such important rights.
 
 
 15
 We first inquire if the Terminal is a place appropriate for political expression. Judge Mansfield saw the determination as between places dedicated to public use where fundamental rights must be recognized and protected and places essentially private where the owner's rights of property and privacy are superior. With the issues thus posed, he properly concluded, that the Terminal is dedicated to the public use, to no less a degree than the streets of a company owned town, Marsh v. State of Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), or the grounds of a World's Fair, Farmer v. Moses, 232 F.Supp. 154 (S.D.N.Y.1964), or the parking lot of a shopping center, Schwartz-Torrance Investment Corp. v. Bakery and Confectionery Workers Union, etc., 61 Cal.2d 766, 40 Cal.Rptr. 233, 394 P.2d 921 (1964), cert. denied, 380 U.S. 906, 85 S.Ct. 888, 13 L.Ed.2d 794 (1965). He emphasized, and we agree, that the placement of title to property is not dispositive for "Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." Marsh v. State of Alabama, 326 U.S. at 506, 66 S.Ct. at 278. Judge Mansfield quoted at length the words of Justice Roberts in Hague v. CIO, 307 U.S. 496, 515, 516, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) which are the touchstone for courts charged with accommodating rights of expression with other interests at play in the public forum:
 
 
 16
 Wherever the title of streets and parks may rest they have immemorially been held in trust for the use of the public and time out of mind, have been used for the purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.
 
 
 17
 In the sense that the general public is afforded ready access to the facilities inside the Terminal, and that the Terminal was created pursuant to compact between two States and administered according to statutory requirements necessary to its function as a facility devoted to public transportation, it cannot be disputed that the Terminal is a public instrumentality — a public place subject to constraints imposed by the Constitution. This determination would conclude our inquiry if the problem involved solely a discrimination in violation of the Fourteenth Amendment and we were asked to determine if the power of the State was so intertwined with the Terminal activity that the Constitution forbade such action. Reitman v. Mulkey, 387 U.S. 369, 375, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4 Cir. 1963).
 
 
 18
 However, where the issue involves the exercise of First Amendment rights in a place clearly available to the general public, the inquiry must go further: does the character of the place, the pattern of usual activity, the nature of its essential purpose and the population who take advantage of the general invitation extended make it an appropriate place for communication of views on issues of political and social significance. The factors to be considered are essentially the same, be the forum selected for expression a street, park, shopping center, bus terminal, or office plaza.[6]
 
 
 19
 The Port Authority argues that the Terminal is an inappropriate site for such activity because the interior of a building is not traditionally a place for exercise of First Amendment rights. Moreover, it is urged that the Terminal is unrelated to the subject under discussion and that the purposes for which the building was constructed do not include plaintiff's suggested activity. We disagree with these views because they evidence too little regard for the vagaries of effective communication, and for the versatility of the First Amendment's proscription. As we have already indicated, the character and function of the Terminal, makes clear that it is a thoroughfare used by thousands of people each day. It is one of the busiest passageways in the country, with persons hurrying to and from subways, buses, shops, theaters, and other streets. In design and physical appearance, the main concourse resembles a street. The fifty foot walk is lined with stores and concessionaires, crowded at some hours and less dense at others. Unlike an office building corridor or an apartment house hallway, Watchtower Bible & T. Soc. v. Metropolitan Life Ins. Co., 297 N.Y. 339, 79 N.E.2d 433, 3 A.L.R.2d 1423, cert. denied 335 U.S. 886, 69 S.Ct. 232, 93 L. Ed. 425 (1948), the people are not simply using the connecting passageway to reach a place where they engage in different, more pacific or reflective activities. They are in the Terminal for the principal purpose of moving to and from other means of transportation — and the space is designed for precisely the purpose of transit. With the scope of operations so vast, the enclosure is desirable and indeed necessary if the congestion and confusion that would attend if all waited for buses on the street are to be avoided. In other times or better climes travelers have waited by the roadside or under some shelter for the oncoming vehicle. But here, the buses drive into the building and the passengers meet them there. The terminal, with its many adjuncts, becomes something of a small city — but built indoors, with its "streets" in effect set atop one another, and vehicles operating under, above, and to the side, not unlike some futuristic design for urban living.
 
 
 20
 Thus, we cannot accept the argument that the mere presence of a roof alters the character of the place, or makes the Terminal an inappropriate place for expression. The privacy and solitude of residents may require that apartment house hallways be insulated from the excitement of volatile exhortations, or the quiet dignity of judicial administration may dictate that courthouse passages be kept free of demonstration.[7] But that is a result based on wisdom and experience because the abrasions caused by any protected speech would too greatly interfere with other interests — and not simply because there is a covering on the building. Indeed, the public forum is surely as traditionally a covered meeting hall as a sunlit arena. Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945); Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949).
 
 
 21
 The Terminal building is an appropriate place for expressing one's views precisely because the primary activity for which it is designed[8] is attended with noisy crowds and vehicles, some unrest and less than perfect order. Like a covered marketplace area, the congestion justifies rules regulating other forms of activity, but it seems undeniable that the place should be available for use in appropriate ways as a public forum. The admission of charity solicitors, glee clubs and automobile exhibitions without untoward incident evidences the ease with which the Terminal accommodates different forms of communication. To deny access to political communication seems an anomalous inversion of our fundamental values. Cf. Wirta v. Alameda Contra Costa Transit District, 64 Cal. Rptr. 430, 434 P.2d 982 (Calif.Sup.Ct. Dec. 12, 1967).
 
 
 22
 The defendant argues that the inappropriateness of the place is demonstrated by the fact that Wolin's message bears no special relation to the operations of the Terminal. The propriety of a place for use as a public forum does turn on the relevance of the premises to the protest, but this relation may be found in two ways. In some situations the place represents the object of protest, the seat of authority against which the protest is directed. See Brown v. State of Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed. 2d 637 (1966); Adderley v. State of Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L. Ed.2d 149 (1966); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). In other situations, the place is where the relevant audience may be found. Here, the plaintiff is attempting to communicate his antiwar protest to the general public and to a special audience — servicemen traveling to and from their bases, particularly buses arriving from Fort Dix. The public is there, more than 200,000 persons a day, and it is likely that the concourse areas are more appropriate for the proposed activity than a narrow sidewalk. And servicemen on leave are in the Terminal also in great numbers.
 
 
 23
 If the Terminal is a proper place for the exercise of First Amendment rights under appropriate regulations, a denial of these rights cannot be based on the statutory authority granted the Terminal officials to bar miscreants and disorderly persons from the facility. N.Y., Penal Law, § 150.[9] As the able trial judge recognized, "the purpose of such disorderly conduct statutes is to prevent terminals from being infested by those `who have no occasion to be there,' such as congregations of degenerates or nondescript characters who pose a danger to the public. * * * No such threat is posed here." 268 F.Supp. at 861; see People v. Bell, 306 N.Y. 110, 115 N.E.2d 821 (1953). The plaintiff is not a "nondescript character" who is a danger to the public. Instead, he seeks to exercise an historic right of freemen, to participate in his society by attempting to persuade others of his position on issues of the utmost importance.
 
 
 24
 Provocative and controversial the discussion may be, but in the excitement generated by political controversy our preconceptions and prejudices are tested. The framers of the Constitution opted for the disharmony of controversy because they believed that in that unrest lay the best prospect of an ordered society.[10]
 
 
 25
 Others may quarrel with Wolin's choice of forum and vigorously dispute his message, but we believe the Port Authority may not abridge his right to choose this place any more than they can control his choice of message. We hold the Constitution precludes the Port Authority from enforcing a plenary prohibition of speech within the Terminal.[11]
 
 III.
 
 26
 We must now consider whether Wolin's proposed activities including distribution of leaflets, carrying placards, setting up card tables, and engaging in conversation with others using the Terminal are entitled to substantial protection under the First and Fourteenth Amendments. Judge Mansfield decided the question with respect to the distribution of leaflets; he carefully considered and countered the assorted reasons offered by defendants in justification of an absolute bar on such activity. Thus, a uniform and absolute prohibition could not be defended on the ground that the action would obstruct traffic since there was no contention that every leaflet distribution would be obstructive regardless of time or location. The prospect of littering from the distribution of political circulars within the facility, while acknowledged, is constitutionally insufficient to support a flat proscription. Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). Similarly, the availability of some alternative forum, and the likelihood of a swarm of protesters each with their special cry disrupting the normal operation of the Terminal, are not material where the issue involves a blanket and wholesale ban. The potential provocation caused by heated debate is not a valid reason to preclude discussion. Judge Mansfield stated it well: "The right of free public expression on political issues is too dearly prized to be curtailed without equally important public cause. Such suppression would be the first step toward ultimate stagnation of essential debate." 268 F.Supp. at 863.
 
 
 27
 We agree with the District Court that a flat prohibition on distribution of leaflets in a place appropriate for political expression cannot stand. The Supreme Court has clearly recognized that "pamphlets (have) become historic weapons in the defense of liberty," and that "public convenience in respect to cleanliness of the streets" does not justify such drastic interference with precious rights of communication. Schneider v. State, 308 U.S. 147, 160-161, 60 S.Ct. 146, 150, 151 (1939); see also Jamison v. State of Texas, 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943); Talley v. State of California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960); Kalven, The Concept of the Public Forum, 1965 Sup. Ct.Rev. 1, 15-21; Emerson, Toward a General Theory of the First Amendment, 72 Yale L.J. 877, 926-28 (1963); Niemotko v. State of Maryland, 340 U.S. 268, 273-289, 71 S.Ct. 325, 95 L.Ed. 267 (1951) (separate opinion of Frankfurter, J.). It seems to us that these cases clearly establish that non-commercial leaflet distribution is an essential right that cannot be barred except for especially good reason, and that the burden of street cleaning is not good enough. We believe it beyond dispute that the congestion and controversy that may attend the activity in the Terminal, while pertinent to the enactment of rules and regulations to govern the activity, cannot be invoked to support a flat prohibition.
 
 
 28
 Although Judge Mansfield directed the defendant to incorporate the other activities proposed by the plaintiff in the new regulations he ordered the Port Authority to issue, the Judge does not seem to have determined if those activities were protected under the First Amendment. His hesitancy is understandable for we might look in vain through recent Supreme Court cases involving public demonstrations for some resolution of the problem whether picketing, marches, placards and similar modes of communication are afforded comparable respect under the Constitution.[12] But we are obliged to resolve the issues sharply presented to us by the record.
 
 
 29
 We believe each proposed activity must be afforded some measure of protection. Whether we speak of placards or conversation or tables laden with literature[13] we deal with forms of communication developed to express the plaintiff's views to the particular audience. The methods adopted may be unsophisticated or crude and even ineffectual when compared with other means, but they are no less robust and no less intended to air the speaker's views as effectively as his resources and energy permit.[14] The techniques involved here are peaceful and orderly; we deal with an attempt to communicate directly by forms that are classic in simplicity and worthy of emulation. Ronald Wolin does not present us with a program of coercion or defiance of laws or physical confrontation. He asks that he and his associates be permitted to stand with placards and converse with persons who accept their handbills; also, that they be allowed to set their display on tables rather than floors. In this context, such activity is the substance of the "free trade in ideas" no less than the soapbox orator, Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J. dissenting). No less than the leaflet, the newspaper, or the oration it appeals to "the power of reason as applied through public discussion," Whitney v. People of State of California, 274 U.S. 357, 375, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J. concurring).
 
 
 30
 We should in these times be mindful that to the extent we secure legitimate and orderly access to means of communication for all views, we create conditions in which there is no incentive to resort to more disruptive conduct. Ronald Wolin seeks protection through the channels of his government of rights accorded him by the Constitution and we, as the agency of that government charged with securing those rights, ought ensure that no unneeded delay encumber the exercise of such critical freedoms.
 
 IV.
 
 31
 We are brought then to consideration of the regulations under which the plaintiff was denied access to the Terminal. Judge Mansfield found, and we agree, that the present regulations are an excessive delegation of unfettered discretion placed in the power of the Terminal Manager, defendant Rubbert, and that therefore they are unconstitutional. Cox v. State of Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). The effect of the present regulations is to empower a single official to refuse access on his mere opinion that a denial will prevent inconvenience and disorder. By such devices official authority can become "an instrument of arbitrary suppression of opinion on public questions." Cox v. State of New Hampshire, 312 U.S. 569, 577, 61 S.Ct. 762, 766, 85 L.Ed. 1049 (1941).
 
 
 32
 As we have indicated, the District Court directed the defendant to promulgate new regulations carefully drawn to control the conduct of plaintiff and similar groups within the building. No one can question the legitimate public interest in maintaining a free flow of traffic in the Terminal, in avoiding excessive disruption of normal activities there, in ensuring the convenience and movement of passengers and vehicles. To meet this need, the relevant authority, whether municipal or otherwise, may prescribe "rules of order" for the use of the premises. The character of the place, including the number of persons passing through at different times and the enclosed design of the forum, will affect the degree of restriction tolerable under the Constitution. We need not — indeed it would be inadvisable for us to do so without more adequate information — prescribe in detail the standards or terms of such rules. We believe the drafting of regulations is, in the first instance, properly the function of the responsible officials. But, some guidelines are in order. In accommodating the interest of protesters and general public, the Port Authority may set approximate and reasonable limitations on the number of persons who may engage in such activities at any specific time, the duration of the activity and the specific places within the building where the rights of expression may be exercised. Certainly, the officials in drawing these rules will be mindful that the plaintiff has a constitutionally cognizable interest in reaching a broad audience, that he is entitled to do so within limits tolerable in light of the usual activities in the Terminal.[15]
 
 
 33
 In drawing appropriate regulations the Terminal officials may consider whether the circumstances justify a requirement that groups like those represented by the plaintiff should give advance notice to the Terminal officials. Such notice requirements must be examined with special care in view of the tendency to abuse. See Cox v. State of New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); Freund, Supreme Court and Civil Liberties, 4 Vand. L.Rev. 533 (1951). Whether the circumstances in this case support such a requirement properly rests in the first instance with the officials who will draft the regulations, and therefore, we intimate no view on this question.
 
 
 34
 In the exercise of his rights under fair and reasonable regulations, the plaintiff is also entitled to protec-by the Terminal police.[16] Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); Kelly v. Page, 335 F.2d 114 (5 Cir. 1964); Williams v. Wallace, 240 F. Supp. 100 (M.D.Ala.1965). This protection should be included in the order issued by the court so that the officials will be on notice of their constitutional responsibility to protect those properly exercising rights of expression. In this way the district court will be discharging its responsibility to reconcile the interests at odds in the public forum.
 
 
 35
 One final observation. It is essential that these regulations be issued promptly. The plaintiff has waited many months for the protection of rights secured to him by the Constitution. These rights are as effectively stifled by delay as by suppression.
 
 
 36
 We therefore affirm the order as modified. The District Court is directed to retain jurisdiction and prescribe a time schedule for the promulgation and adoption of reasonable, non-discriminatory regulations of general application governing the activities proposed by the plaintiff. Pending the adoption and approval of those regulations, the plaintiff and those represented by him will be permitted to engage in such activities in a manner consistent with the standards set forth above.
 
 
 
 Notes:
 
 
 [1]
 The plaintiff Ronald Wolin sues individually and on behalf of two organizations opposed to United States policy in Vietnam. The organizations are the Fifth Avenue Vietnam Peace Parade Committee and the Veterans and Reservists to End the War in Vietnam
 
 
 [2]
 Defendants are the Port of New York Authority, Albert Rubbert, the Manager of the Port Authority Bus Terminal, Captain Robert Friend, Commanding Officer of the Port Authority Police, and Lieutenants James Pettis, Fred Rackowski, Hugo Serrati, Anthony Unetich and George Gaulrapp, Officers of the Port Authority Terminal Police. We shall refer to the defendants collectively as the "Port Authority," and to the building as the "Terminal."
 
 
 [3]
 The Terminal police are expressly provided with the powers of "peace officers." N.Y.Code of Crim.Proc. § 154
 
 
 [4]
 The Manager of the Terminal based his refusal of Wolin's request on the following rules and regulations promulgated pursuant to § 6419, McKinney's Unconsolidated Laws:
 "2. The Superintendent of the Terminal shall have authority to deny the use of the Terminal to any individual violating Port Authority Rules and Regulations, or laws, ordinances or regulations of * * * the State of New York or the City of New York.
 "5. No person shall carry on any commercial or other activity at the Terminal without permission.
 "8. No person shall post, distribute or display signs, advertisements, cirlars or printed or written matter within the Terminal without permission."
 In addition, without defining what constitutes a "nuisance," Regulation 12 prohibits any person from doing any act or thing which shall result in a creation or maintenance of a "nuisance" at the Terminal. In practice the decision to grant or deny a request in any particular case has been delegated by the Port Authority to Rubbert, the Manager of the Terminal, and it has been stipulated that his consistent policy is to deny all requests made by individuals or groups seeking access to the Terminal for the purpose of distributing leaflets or engaging in other protest activities.
 It is not disputed that the Port Authority has in the past granted permission to use the facility for other purposes. Charitable contributions have been solicited, glee clubs have sung in the Terminal, and broadcast their performance over the loud speaker system. Moreover, on occasion and for a fee, the Terminal has permitted automobile manufacturers to display their products and to distribute promotional literature in the concourse areas. The Port Authority has indicated that those who wished to communicate political views were denied access because — unlike these other groups — their activity is provocative and controversial.
 
 
 [5]
 268 F.Supp. 855 (S.D.N.Y.1967)
 
 
 [6]
 See Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup.Ct. Rev. 1; Note, Regulation of Demonstrations, 80 Harv.L.Rev. 1773 (1967)
 
 
 [7]
 Watchtower Bible & T. Soc. v. Metropolitan Life Ins. Co., 297 N.Y. 339, 79 N.E.2d 433, cert. denied 335 U.S. 886, 69 S.Ct. 232, 93 L.Ed. 425 (1948). State v. McNair, 178 Neb. 763, 135 N.E.2d 463 (1965)
 
 
 [8]
 Under McKinney's Unconsolidated Laws § 6701, a bus terminal exists "* * * for the accommodation of omnibuses and other motor vehicles operated by carriers engaged in the transportation of passengers, or for the loading, unloading, interchange or transfer of such passengers or their baggage, or otherwise for the accommodation, use or convenience of such passengers or such carriers or their employees * * *" It cannot be doubted that the public is afforded free access to the facilities for this purpose, and that the activity is necessarily accompanied by the noise and unrest of hurrying crowds. Further, it is clear that the character and function of the place chosen for protest will affect the limits of tolerable disruption from protest. In Edwards v. South Carolina, 372 U.S. 229, 233, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) the Supreme Court granted protection to "boisterous," "loud," and "flamboyant" conduct in the form of cheering and singing in a statehouse driveway during the day. See also Cox v. State of Louisiana, 379 U.S. 536, 546-548, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). Similar activity would not receive the same treatment if it was conducted near a hospital, in a public library, an apartment hallway, or a city council chamber, places where "order and tranquillity of a sort entirely unknown to the public streets are essential to their normal operation." See Brown v. State of Louisiana, 383 U.S. 131, 157, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (Black, J., dissenting) (see also 383 U.S. at 139, 86 S.Ct. 719 (dictum)); Watchtower Bible & T. Soc. v. Metropolitan Life Ins. Co., supra; State v. McNair, 178 Neb. 763, 135 N.W. 2d 463 (1965) (singing and marching in city council chamber). See generally, Note, Regulation of Demonstrations, 80 Harv.L.Rev. 1773, 1774-1775 (1967)
 
 
 [9]
 "§ 150. Peddling, unauthorized soliciting of business or trade, begging or loitering on air and bus terminal property
 * * * * *
 "2. Any person who loiters about any toilet, area, station, station platform, waiting room or any other appurtenance of an air or bus terminal, or who is found sleeping therein or thereon and who is unable to give satisfactory explanation of his presence is guilty of an offense."
 
 
 [10]
 "Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." Terminiello v. City of Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949), quoted in Cox v. State of Louisiana, 379 U.S. at 551-552, 85 S.Ct. 453, 13 L.Ed.2d 471
 
 
 [11]
 In the rare case where the speech itself amounts to illegal activity, as where the speaker incites desertion from the armed forces or counsels insubordination by a serviceman, see 18 U.S.C. §§ 1381, 2387, the speaker is of course subject to arrest on warrant or probable cause and to prosecution in the normal course
 
 
 [12]
 The Court seems to remain split on the critical issue whether public demonstrations are entitled to substantial protection. Compare opinions by Justice Black in Adderley v. State of Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) and Brown v. State of Louisiana, 383 U.S. 131, 151, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (dissenting with opinions by Justice Fortas in Brown v. State of Louisiana, 383 U.S. 131, 86 S.Ct. 719 (1966) and Justice Douglas in Adderley v. State of Florida, 385 U.S. 39, 48, 87 S.Ct. 242 (1966). See also Justice White's opinion in Brown v. State of Louisiana, 383 U.S. 131, 150, 86 S.Ct. 719 (1966) and Justice Stewart's opinion in Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). See Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup.Ct. Rev. 1
 
 
 [13]
 The New York Court of Appeals has recently decided that the use of card tables on a street for the distribution of political literature is protected against plenary denial. People v. Katz, 21 N.Y.2d 132, 286 N.Y.S.2d 839, 233 N.E.2d 845 (Dec. 28, 1967). The potential of card tables for obstruction of traffic is sufficiently great that it may be reasonable to bar their use from the Terminal even at times when other techniques of communication are permissible. We leave that decision in the first instance to the appropriate officials who draw the regulations
 
 
 [14]
 Professor Meiklejohn put it this way: "What is essential is not that everyone shall speak, but that everything worth saying shall be said." A. Meiklejohn, Political Freedom: The Constitutional Powers of the People 25-28 (1960); V. O. Key, Public Opinion and American Democracy 378-387 (1961); Barron, Access to the Press — A New First Amendment Right, 80 Harv.L.Rev. 1641 (1967); Ferry, Masscomm as Educator, 35 Am.Scholar 293 (1966)
 
 
 [15]
 See, e. g., Cottonreader v. Johnson, 252 F.Supp. 492 (M.D.Ala.1966); Williams v. Wallace, 240 F.Supp. 100 (M.D.Ala.1965); Farmer v. Moses, 232 F.Supp. 154 (S.D. N.Y.1964); 1621 Inc. v. Wilson, 402 Pa. 94, 166 A.2d 271 (1960); Anora Amusement Corp. v. Doe, 171 Misc. 279, 12 N. Y.S.2d 400 (Sup.Ct.1939). Note, Regulations of Demonstrations, 80 Harv.L.Rev. 1773 (1967)
 
 
 [16]
 In Wright v. State of Georgia, 373 U.S. 284, 293, 83 S.Ct. 1240, 1246, 10 L.Ed.2d 349 (1963) the Supreme Court said that "the possibility of disorder by others cannot justify exclusion of persons from a place if they otherwise have a constitutional right * * * to be present." See also Brown v. State of Louisiana, 383 U.S. 131, 133 n. 1, 86 S.Ct. 719, 15 L.Ed. 2d 637 (1966). Of course the law enforcement officers must be permitted to exercise judgment in maintaining order within the Terminal. We hold simply that the order acknowledge the established proposition that the speaker must be protected from undue harassment by others