INTERNATIONAL SOCIETY FOR
KRISHNA CONSCIOUSNESS,
INC., et al., Plaintiffs,

v.

Walter LEE, et al., Defendants.

No. 75 Civ. 5388 (MJL).

United States District Court,
S.D. New York.

Sept. 15, 1989.

See also 105 F.R.D. 435.

Fisher & Moest by David Grosz, Robert C. Moest, Barry A. Fisher, David M. Liberman, Los Angeles, Cal., and Levy, Gutman, Goldberg & Kaplan by Eugene N. Harley, New York City, for plaintiffs.

Patrick J. Falvey by Arthur P. Berg and Arnold D. Kolikoff, New York City, for defendants.

## OPINION AND ORDER

LOWE, District Judge.

Plaintiff International Society for Krishna Consciousness ("ISKCON") commenced this lawsuit in 1975, challenging the policy of the Port Authority of New York and New Jersey which prohibits the continuous and repetitive distribution of literature to, and solicitation of contributions from, passers-by in the public areas of the passenger terminals at John F. Kennedy, LaGuardia, and Newark International Airports ("the airports"). Plaintiffs claim that the Port Authority's prohibition of these activities within the public areas of the airports violates their rights under the First and Fourteenth Amendments of the United States Constitution. Presently before this Court is plaintiffs' motion for summary judgment declaring the Port Authority's regulation unconstitutional. For the reasons set forth below, we adopt the Magistrate's recommendation and grant plaintiffs' motion pursuant to Fed.R.Civ.P. 56.

## BACKGROUND

Pursuant to a 1921 Congressionally consented-to compact between the States of New York and New Jersey, the Port Authority is charged with operating the airports at issue in this action. Numerous airlines lease much of that airport space for their own business purposes, and these leased areas are primarily within the control of the airlines. However, the unleased areas, namely, the Arrivals Building of the International Arrivals Building at Kennedy, the Central Terminal Building at LaGuardia, and the North Terminal at Newark, remain within the control of the Port

Authority. Affidavit of Morris Sloane at ¶ 4.

Plaintiff ISKCON is a New York not-for-profit religious corporation which promotes the theological and missionary views of the Krishna Consciousness. Plaintiff Brian Rumbaugh is a member and trustee of ISKCON. As related by counsel for plaintiffs, members of the Krishna Consciousness, in accordance with their religious mandate, are required to perform a ritual known as *sankirtan*, which consists of "going into public places, disseminating religious literature, and soliciting funds to support the religion." Plaintiff's Brief in Support of Motion for Summary Judgment at 6. The performance of *sankirtan* is apparently integral to the practice of Krishna Consciousness, indeed it is "the very lifeblood and principal means of support of this religious movement." *Id.* It is the performance of precisely these activities, however, which the Port Authority, through its regulations, prohibits within the public areas of the airports.

ISKCON commenced this action in 1975 against the Port Authority and its then Police Superintendent, Walter Lee. Because plaintiffs were, in the initial stages of this litigation, seeking access to airline-controlled property as well, Judge Carter—before whom this action was then pending [1]—held the airlines to be indispensible parties and, on that basis, denied plaintiffs' motion for preliminary injunctive relief. *International Society for Krishna Consciousness v. New York Port Auth.*, 425 F.Supp. 681 (S.D.N.Y.1977). Shortly thereafter, plaintiffs amended their Complaint to include, as defendants, several of the airlines leasing space from the Port Authority.

Arguing that their prohibition of plaintiffs' activities did not constitute state action, the airlines moved, in 1979, for dismissal of the Complaint as against them. This Court denied their motion, but certified the state action question to the Second Circuit. After accepting certification, the Court of Appeals subsequently remanded the case for further discovery and development of the evidentiary record. *ISKCON v. Air Canada*, 727 F.2d 253 (2d Cir.1984). In 1984, we referred the action to Magistrate Michael H. Dolinger for completion of all pretrial matters.

Once discovery was completed, the airlines again moved for dismissal. In 1987, Magistrate Dolinger issued a Report and Recommendation in which he urged that, because the state action requirement had been satisfied, the motions be denied. Subsequent to this Report's issuance, all of the airlines entered into settlement agreements with plaintiffs. Consequently, the Superintendent of the Port Authority Police remains the only defendant to this action.[2]

Arguing that the Port Authority's regulations unconstitutionally prohibit protected First Amendment activity within a public forum, plaintiffs moved, in 1987, for summary judgment or, in the alternative, for a preliminary injunction.[3] Significantly, or so defendant argues, the Port Authority formally adopted regulations, in February of 1988, which prohibit, within the terminal buildings, the type of activity encompassed by *sankirtan*. However, these new regulations do not appear to interfere with the performance of that ritual in the exterior portions of the airports outside the terminal buildings. *See* Affidavit of Morris Sloane, Exhibit B.[4]

---

1. The present action was transferred to this Court in September of 1978.

2. In 1977, Judge Carter dismissed the Port Authority as a defendant pursuant to *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). *International Society*, 425 F.Supp. at 684–85.

3. This alternative request for relief was later withdrawn in view of an agreement between the parties which permits the plaintiffs access to the terminal areas *pendente lite.*

4. The new regulations provide in pertinent part:
    B. Non-commercial activity at Port Authority air terminals which are not occupied by a lessee, licensee or permittee is subject to the following conditions and restrictions: ...
    1. The following conduct is prohibited within the inetrior areas of buildings or structures at an air terminal if conducted by a person to or with passers-by in a continuous or repetitive manner:
    (a) ...

In his Report and Recommendation ("R & R"), dated October 25, 1988, Magistrate Dolinger found that the terminal areas of the airports are, indeed, public fora, and accordingly held that the Port Authority's regulations unconstitutionally restrict the plaintiffs' First Amendment rights. Presently before this Court is the Magistrate's recommendation that plaintiff's motion for summary judgment be granted.

### DISCUSSION

### THE RELEVANT FORUM

■ The preliminary issue raised by the Magistrate's R & R, and defendant's Objections thereto, is what effect the Port Authority's newly adopted regulations have on the scope of this Court's inquiry. Defendant urges that all of the real property used in terminal operations—including the exterior sidewalks outside the terminal buildings where *sankirtan* is permitted—should be viewed as the relevant forum and that, accordingly, the regulations at issue be treated as time, place and manner restrictions. Adoption of this approach would have a significant impact on the course of this litigation since, as the R & R indicates, plaintiffs have disclaimed any intention of litigating the validity of such place restrictions. R & R at 8; Transcript of March 25, 1988 hearing at 19. In effect, there would be no litigable controversy remaining and this Court would be forced to dismiss the action.

However, we agree with the Magistrate that "in defining the forum we [should focus] on the access sought by the speaker." *Cornelius v. NAACP Legal Defense and Education Fund*, 473 U.S. 788, 801, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). In the instant case, plaintiffs have consist-

ently limited their demands for access to the interior of the terminal buildings only. Plaintiffs have never, during the fourteen year course of their lawsuit, sought similar access to the airports' exterior sidewalks, nor have they placed their availability in issue, presumably because their status as public fora is beyond peradventure. Moreover, defendant's identification of all airport property as the relevant forum, itself, appears to be of very recent origin. Thus to adopt, at this stage of the proceedings, defendant's present position as to the relevant forum would not only be contrary to the authority of *Cornelius*, but also "fundamentally unfair" given plaintiffs' disclaimer and the underlying "assumption ... shared by all parties, that this lawsuit involved only the building interiors." R & R at 10.

In his Objections to the R & R, defendant argues that to define the relevant forum in accordance with the dictates of *Cornelius*, as the Magistrate did, would be "illogical since such an approach would render any place restriction on First Amendment activity a prohibition" and would consequently lead to absurd results. Defendant's Memorandum of Law in Support of Objections at 47. By way of example, defendant argues that a hypothetical prohibition on leafletting activity in the eastern portion of a public park would not, under *Cornelius*, be treated as a place restriction on such activity, but as a prohibition. *Id.*

Defendant's Objections on this point are flawed for two reasons. First, defendant fails to offer any alternative legal standard for defining the relevant forum other than the one supplied by *Cornelius*. Instead, and without supporting legal authority, defendant presumes that by adopting airport-wide regulations, he can, overnight, broad-

(b) The sale or distribution of flyers, brochures, pamphlets, books or any other printed or written material.

(c) The solicitation and receipt of funds.

. . . . .

2. The following conduct is prohibited at an air terminal:

(a) ...

(b) The performance of any ceremony, speech, song, carrying of any sign or placard, or other such activity which constitutes a danger to

persons or property, or which interferes with the orderly formation and progression of waiting lines, or which interferes with any of the following: pedestrian and/or vehicular travel; the issuance of tickets or boarding passes or equivalent documents for air or ground transportation; luggage or cargo movement or handling; the entry to and exit from vehicles; security procedures; government inspection procedures; cleaning, maintenance, repair or construction operations.

en the scope of this Court's examination. In this approach, defendant places the proverbial cart before the horse. It is not the contested regulations which define the relevant forum, but the particular forum, and the access sought therein, which determines the propriety of the regulations.

Second, defendant's argument presumes that, like his hypothetical park, the interior and exterior portions of the terminal buildings are physically and functionally similar units of the airports as a whole. In point of fact, the exterior sidewalks in the present case share few of the characteristics of the terminals' broad interior vistas. Indeed, those sidewalks are physically, functionally, structurally and conceptually distinct from the airports' interior buildings and hardly offer the same opportunity for effective First Amendment communication. Defendant's argument glosses over these important distinctions and posits a focus too broad and artificial for meaningful forum analysis. Accordingly, we adopt the Magistrate's determination that the interior airport terminals constitute the relevant fora.[5]

## THE TERMINALS AS PUBLIC FORA

■ All parties to the present action concede that the activity in which plaintiffs seek to engage is, for First Amendment purposes, protected activity.[6] The central issue raised by the instant motion, then, is under what standard should the Port Authority's regulations be reviewed—an issue which, in turn, rests upon how the airport terminals are classified as fora. *Cornelius*, 473 U.S. at 797, 105 S.Ct. at 3446 (the extent to which the government may limit public access to its property depends on whether the property is a public or nonpublic forum). Plaintiffs assert that the terminals' physical and conceptual similarities to city streets and sidewalks, their identity as "covered public thoroughfares," mandate

their treatment as traditional public fora. Citing the terminals' unique characteristics and the Supreme Court's arguably narrow definition of the public forum family, defendant urges, on the other hand, that the airports be regarded as non-public fora.

In *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1982), and *Cornelius*, the Supreme Court identified three categories of fora—the traditional public forum, the designated public forum, and the non-public forum—and outlined the standards for review applicable to each within the First Amendment context. In both traditional and designated public fora, the government may not impose content-based restrictions on First Amendment activity unless those restrictions are narrowly tailored to further a compelling state interest. However, the government may impose in those fora content-neutral time, place and manner restrictions, provided such restrictions serve significant governmental interests and leave adequate alternative channels of communication open. *Perry*, 460 U.S. at 45, 103 S.Ct. at 955; *Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3448. In a non-public forum, by contrast, the government may restrict expression, so long as the restrictions are reasonable and do not discriminate against certain viewpoints. *Perry*, 460 U.S. at 46, 103 S.Ct. at 955.

It is now well settled that streets, parks and sidewalks are traditional public fora. These public places have been deemed "held in trust for the use of the public ... for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939); *see also Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449; *Perry*, 460 U.S. at 45, 103 S.Ct. at 955. Such places have, accordingly, been deemed "quintessential" public

---

**5.** We also agree with plaintiffs that other courts have impliedly rejected similar propositions. *See, e.g., Int'l Society for Krishna Consciousness v. Rochford*, 585 F.2d 263, 272 (7th Cir.1978) (City's contention "that any denial of use of airport facilities would not prevent the Krishna Society from presenting its views anywhere else

in Chicago or even on the sidewalks outside the airport terminal" rejected).

**6.** *See Organization For A Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971); *Murdoch v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943).

fora. *Id.; see also Frisby v. Schultz,* ——U.S. ——, 108 S.Ct. 2495, 2499, 101 L.Ed.2d 420 (1988). The designated public forum is, by contrast, one which the "State has [intentionally] opened for use by the public as a place for expressive activity." *Perry,* 460 U.S. at 45, 103 S.Ct. at 955; *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449 ("The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse"); *Calash v. City of Bridgeport,* 788 F.2d 80, 82 (2d Cir.1986). Despite occasional conflation of the characteristics of these two categories, no serious contention is made here that the terminals fall within the designated forum family. Instead, plaintiffs assert that the airports' unique kinship to city streets render them "well within the notion of traditional public fora." Plaintiffs' Brief in Support of Motion for Summary Judgment at 26.

The Supreme Court has not yet ruled on the issue of whether airports constitute public fora. In *Board of Airport Commissioners of Los Angeles v. Jews for Jesus,* 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987), it granted certiorari on the question, but decided, since the regulation at issue amounted to a "sweeping ban" on all expressive activity, to rule on grounds of overbreadth. Consequently, the issue of the airport's status as a public forum was left unaddressed. The Second Circuit has also not decided whether airports are public fora, but has decided that similar transportation facilities warrant public forum treatment. *Wolin v. Port of New York Authority,* 392 F.2d 83 (2d Cir.) (Port Authority bus terminal public forum), *cert. denied,* 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968).

Nevertheless, every circuit which has decided the issue has uniformly held that the public terminal areas of large municipal airports are public fora. *Jamison v. City of St. Louis,* 828 F.2d 1280, 1283 (8th Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1289, 99 L.Ed.2d 499 (1988); *Jews for Jesus v. Airport Com'rs of Los Angeles,* 785 F.2d 791, 795 (9th Cir.1986), *aff'd on other grounds,* 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987); *USSW Africa v. U.S.,* 708 F.2d 760, 764 (D.C.Cir.1983); *Fernandes v. Limmer,* 663 F.2d 619, 627 (5th Cir.1981), *cert. dismissed,* 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982); *Chicago Area Military Project v. City of Chicago,* (hereinafter "CAMP") 508 F.2d 921, 926 (7th Cir.), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975); *Kuszynski v. City of Oakland,* 479 F.2d 1130, 1131 (9th Cir.1973); *ISKCON v. Wolke,* 453 F.Supp. 869, 872 (E.D.Wisc.1978); *ISKCON v. Griffin,* 437 F.Supp. 666, 672–73 (W.D. Pa.1977); *ISKCON v. Rochford,* 425 F.Supp. 734, 742 (N.D.Ill.1977), *aff'd in part, rev'd in part,* 585 F.2d 263 (7th Cir. 1978); *ISKCON v. Engelhardt,* 425 F.Supp. 176, 180 (W.D.Mo.1977). These courts found that the airports at issue were comparable to city streets in both physical and conceptual aspects which made it appropriate to accord them public forum status. Continuously open to the public and lined with shops, restaurants, newsstands and other businesses for use by the general public, these airports were found to be no less than covered public thoroughfares, indistinguishable from ordinary municipal streets save for their interior nature. *See, e.g., Jamison,* 828 F.2d at 1283; *USSW Africa,* 708 F.2d at 764; *CAMP,* 508 F.2d at 925; *see also Wolin,* 392 F.2d at 89 (Port Authority bus terminal physically resembles city street). The pattern of activity and the number of people who used the fora daily were also relevant considerations. *See, e.g., USSW Africa,* 708 F.2d at 764.

Lined with all type of services "from banks to barbers to Bloomingdales," so too do the terminals here possess the characteristics of a bustling metropolitan boulevard. Plaintiffs' Memorandum of Law at 37.

> Publicly owned, conceived for public use, continuously open, stocked with a congeries of commercial sellers, dispensers of information, and diversions and conveniences of all sorts, they constitute one of the great crossroads in the vast metropolitan New York region and the nation's foremost hub of international travel,

commerce, and exchange of information ... The New York airports fit well within the notion of traditional public fora.

*Id.* at 25–26. Guided by the overwhelming precedent in this area, the Magistrate found plaintiffs' analogy to be a sound and persuasive one. So do we.

In so finding, however, the Magistrate's R & R appears to have moved beyond the two public forum categories—traditional and designated—enumerated in *Perry* and *Cornelius*, in order to incorporate the airport terminals within the public forum family. R & R at 13–14. In this approach, we do not concur, for we find that, as the functional equivalent of public streets, the airport terminals fit "well within the notion of traditional public fora." Accordingly, we need not address defendant's Objections to the R & R on this point.

We must, however, contend with defendant's initial argument, raised in his summary judgment papers, regarding the scope of the traditional public forum category. Defendant's understanding of this classification is a narrow one, limited to "streets and parks" alone, both of which defendant characterizes as a "unique species of public property." Defendant's Memorandum of Law at 16. This Court does not read *Perry* or *Cornelius* so narrowly. Had the Supreme Court intended its list of traditional public fora to be exhaustive, rather then merely paradigmatic, we believe it would have used more restrictive language. Indeed, the predecessors of those opinions appear to have invited extension of the traditional public forum concept by analogy. *See Hudgens v. NLRB*, 424 U.S. 507, 515, 96 S.Ct. 1029, 1034, 47 L.Ed.2d 196 (1976) ("The essence of those opinions is that streets, sidewalks, parks, *and other similar public places* are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely"); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1973) ("Here, we have no open spaces, no meeting hall, park, street corner, *or other public thoroughfare*"); *Hague v. C.I.O.*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1938) ("Such use of the streets *and public places* has, from ancient times, been a part of the privileges, immunities, rights and liberties of citizens"). We think it unlikely that, by its brief enumeration, the *Perry* court intended to undo literally scores of lower court decisions, within and without this Circuit, which, relying on this earlier authority, built on the public forum concept by analogy. *See, e.g., Jamison*, 828 F.2d 1280, 1283 (8th Cir.1987) ("an airport terminal is much like a busy city street"), *cert. denied*, —— U.S. ——, 108 S.Ct. 1289, 99 L.Ed.2d 499 (1988); *Fernandes*, 663 F.2d 619, 627 (5th Cir.1981) ("in view of ... the commercial, street-like character of the terminal concourses ... the [Dallas–Fort Worth] terminal buildings must be treated as public forums"), *cert. dismissed*, 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982); *CAMP*, 508 F.2d 921, 925 (7th Cir.1975) (terminal buildings at O'Hare Airport "resemble those public throroughfares which have long been recognized to be particularly appropriate places for the exercise of constitutionally protected rights to communicate ideas and information"), *cert. denied*, 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975); *Wolin*, 392 F.2d 83, 89 (2d Cir.1968) ("The [bus] terminal, with its many adjuncts, becomes something of a small city—but built indoors, with its "streets" in effect set atop one another ..."), *cert. denied*, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968). *See also Frisby v. Schultz*, 108 S.Ct. at 2499 (public streets are "the *archetype* of a traditional public forum"). Nor do we find it plausible that the mere presence of a roof would preclude the terminals' designation as public fora when, in every other relevant respect, they are virtually identical to public streets and thoroughfares.

The second, and final, basis for defendant's Objections to the Magistrate's R & R is his view that the airport terminals are completely dissimilar to city streets "because unlike city streets they are devoted to the single purpose of facilitating air travel. This purpose is reflected in the

airport terminals' financing, planning, conditions of congestion, creation of "captive audiences," isolation from the surrounding communities and virtually unique security problems." Affidavit of Morris Sloane at ¶ 10. Although we find the R & R adequately addressed these matters, we will briefly elaborate upon those points highlighted by the defendant's Objections.

Citing *Calash*, 788 F.2d 80 (2d Cir.1986) and *International Society for Krishna Consciousness v. New Jersey Sports and Exposition Authority*, 691 F.2d 155 (3d Cir.1982), defendant argues that the airports' specialized financing, reflecting their specialized purpose, precludes their denomination as public fora.[7] Defendant's reliance on *Calash* and *New Jersey Sports* for this proposition, however, is misplaced. No serious contention appears to have been made that the municipal stadium and the sports complex, respectively at issue in those cases, fell within the traditional public forum category. Rather, the issue raised was whether those facilities had somehow been *designated* as public fora—an issue which is plainly not before this Court. The issue of funding in those cases was therefore relevant in determining whether the sites had been intentionally opened as fora for public discourse. *See, e.g., Calash*, 788 F.2d at 83 ("Under this approach, the circumstances under which the forum was created here show that the City did not intend to open Kennedy Stadium to the general public for all uses or permit its use as a profit making venture. The facility was constructed with funds provided by a federal grant and designated as a "service facility" "). We also agree with plaintiffs that there are significant functional distinctions between the terminals and those sites at issue in *Calash* and *New Jersey Sports*, for "unlike racetracks and stadia, which are "event specific," the airports here are continuously open without restriction on access by the general public." Plaintiffs' Response to Defendant's Objections at 10.

Defendant further argues that the presence of captive audiences distinguishes the airports from the traditional public fora of streets and parks. Defendant's Objections at 27. With this contention, we do not agree. Captive audiences group outside city concert halls, movie theaters, and outdoor concession stands to the same extent as they form at airport ticket counters, baggage conveyer belts, and security checkpoints. As the R & R indicates, bus terminals and railroad stations suffer from identical problems as well. R & R at 19. Such concerns, however, are the appropriate subject of reasonable time, place and manner restrictions, not blanket prohibitions on expressive activity.[8]

Nor are pedestrian congestion and security concerns unique to the terminal facilities. Indeed, if concerns over the movement of traffic were sufficient justification for the suppression of First Amendment activity, then the clogged and narrow arteries of downtown Manhattan might, as easily, be denied public forum status. Like the presence of captive audiences, the Port Authority's legitimate concerns over congestion[9] and security are more appropriately the subject of time, place and manner restrictions. *See, Fernandes*, 663 F.2d at 626 (traffic concerns do not "justify the total exclusion of those wishing to exercise free speech"); *Wolin*, 392 F.2d at 91 (absolute prohibition of leafletting cannot be defended on the ground that it would obstruct traffic).

---

**7.** Unlike streets and parks which are financed from general tax funds, the airports are financed from user fees and are therefore financially self-supporting.

**8.** Defendant's reliance on *Lehman* might be more persuasive were plaintiffs seeking access to the aircraft, themselves. We agree with plaintiffs, however, that, as it stands, defendant's analogy between the terminals and *Lehman's* city bus interior is, at best, "farfetched." Plaintiffs' Response to Defendant's Objections at 11. *See also USSW*, 708 F.2d at 767 ("A person

in the airports' concourse or walkways who considers advertisement ... to be objectionable enjoys the freedom simply to walk away that a passenger on a bus does not").

**9.** It should also be noted that plaintiffs do not seek to perform *sankirtan* in any private offices, ticket counters and lines, check-in areas, baggage claim areas, or exclusively-leased waiting areas—in short, those areas where concerns over security, congestion and captive audiences may be particularly acute. Plaintiffs' Statement of Facts at ¶ 73.

Finally, and without much elaboration upon this proposition, defendant urges that the airports' lack of "integration into the surrounding community" precludes their denomination as public fora. Defendant's Objections at 24. If, by this argument, defendant means that geographical proximity to the surrounding community is an essential component of public forum status, he is quite mistaken, for remote, residential streets, removed from a city's nerve center, are no less deserving of such status than Times Square itself.[10] *Frisby*, 108 S.Ct. at 2500. If, on the other hand, defendant means that surrounding community members must pass through the situs on a daily basis, he fails to cite any authority for so sweeping a proposition. His reliance on *Flower v. United States*, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972), and *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) is entirely misplaced. The basis for the Supreme Court's different treatment of the military reservations at issue in those cases was its finding, in *Flower*, that by allowing free and unrestricted access to Fort Sam Houston, the military authorities there had "abandoned any claim [of] special interest in who walks, talks, or distributes leaflets on [its] avenue[s]." 407 U.S. at 198, 92 S.Ct. at 1843. The terminals at issue here, like the military reservation in *Flower*, are "open" fora; neither the Port Authority nor the airlines deny or monitor access by members of the general public to the interior general circulation areas of the airports. All members of the public are free to frequent the terminal facilities, regardless of whether their presence there is occasioned by a travel-related task. Plaintiffs' Statement of Facts at ¶ 77.

In short, none of the characteristics cited by defendant sufficiently distinguish the airport terminals from the "archetype of a traditional public forum." *Frisby*, 108 S.Ct. at 2499. Nor do we find defendant's repeated invocation of the terminals' "singular purpose of facilitating air transportation" any more persuasive. As the District Court noted in *Fernandes:*

True, the principal purpose of the airport is to move people from one place to another via airplane; but the court must look beyond "principal" purposes to determine whether or not an area is a "public" forum. "Streets" are primarily designed to assist the movement of traffic and people, but they are proper First Amendment forums.

465 F.Supp. 493, 501 n. 4 (N.D.Tex.1979). *aff'd*, 663 F.2d 619 (5th Cir.1981), *cert. dismissed*, 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982). After careful consideration of defendant's Objections, we agree with plaintiffs that the airports' character, pattern of activity and nature of purpose make the terminals appropriate places for the exercise of First Amendment activity and place them squarely within the public forum family. Given that finding, no argument is presented here—nor can one be made in earnest—that defendant's blanket prohibition on leafletting and solicitation is narrowly tailored to further a compelling state interest. There being no genuine issue of material fact raised by the submissions, plaintiffs' motion for summary judgment is granted.

It Is So Ordered.

---

**10.** At any rate, none of the airports at issue here are located more than twenty highway miles from midtown Manhattan and all are freely accessible by a network of major thoroughfares. *See* Plaintiffs' Exhibits 8–10.