925 F.2d 576
 59 USLW 2498, 18 Media L. Rep. 1921
 INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS, INC. and
John Winslow, on behalf of themselves and all
International Society for Krishna
Consciousness members,
Plaintiffs-Appellees,
v.
Walter LEE, Superintendent of Port Authority Police,
Defendant-Appellant.
 No. 1082, Docket 89-9182.
 United States Court of Appeals,
Second Circuit.
 Argued March 27, 1990.
Decided Feb. 8, 1991.
Rehearing and Rehearing In Banc
Denied April 25, 1991.
 
 Arthur P. Berg, New York City (Joseph Lesser, Philip A. Maurer, Arnold D. Kolikoff, New York, New York, of counsel), for defendant-appellant.
 Barry A. Fisher, Los Angeles, Cal. (David Grosz, Robert C. Moest, Fleishman, Fisher & Moest, David M. Liberman, Los Angeles, Cal.; Jeremiah S. Gutman, Eugene N. Harley, Levy, Gutman, Goldberg & Kaplan, New York City, of counsel), for plaintiffs-appellees.
 Arthur Eisenberg, Michael Simon, New York City, for amicus curiae New York Civil Liberties Union.
 Before OAKES, Chief Judge, and WINTER and MINER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Appellant Walter Lee, now deceased, was the official responsible for enforcing a regulation of the Port Authority of New York and New Jersey, the party controlling the defense in the instant matter,[1] banning the solicitation of money and distribution of literature within the terminals of three New York area airports. The district court struck down the regulation on the grounds that "the terminals ... possess the characteristics of a bustling metropolitan boulevard" and are traditional public fora for expressive activity. After the district court's decision, the Supreme Court decided United States v. Kokinda, --- U.S. ----, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), which we believe dictates reversal insofar as the district court invalidated the Port Authority's ban on the in-person solicitation of funds but affirmance insofar as it invalidated the Port Authority's ban on the distribution of literature.
 
 BACKGROUND
 
 2
 This action for declaratory and injunctive relief under 42 U.S.C. Sec. 1983 began in 1975. After several detours described in the district court opinion, see International Society for Krishna Consciousness, Inc. v. Lee, 721 F.Supp. 572, 573-74 (S.D.N.Y.1989), that court entered summary judgment in favor of the International Society for Krishna Consciousness, Inc. ("ISKCON").
 
 
 3
 The essential facts are not contested. ISKCON is a not-for-profit religious corporation whose members perform a ritual known as sankirtan. The ritual consists of "going into public places, disseminating religious literature and soliciting funds to support the religion." While the distribution or sale of religious literature is a major part of the ritual, its primary purpose appears to be fundraising. ISKCON states, for example, that donations received through sankirtan, "including those received for religious literature, not only defray printing and other distribution costs, but are the very lifeblood and principal means of support of [the] religious movement."
 
 
 4
 The Port Authority was created by an interstate compact between New York and New Jersey. It owns or operates some thirty-three facilities within the Port District. Among these are the three airport terminals at issue in the present case, John F. Kennedy International Airport ("Kennedy"), La Guardia Airport ("La Guardia"), and Newark International Airport ("Newark"). Together, these airports constitute one of the busiest and most heavily used metropolitan airport complexes in the world. In 1986, they served nearly 79 million travelers, approximately eight percent of the domestic airline market and more than half of the Trans-Atlantic market. By the latter part of this decade, it is estimated that they will serve at least 110 million passengers per year.
 
 
 5
 Most of the space at Kennedy, La Guardia and Newark is leased to commercial airlines, each of which bears primary responsibility for its own leasehold. The Port Authority retains control over the unleased portions of the airports--specifically, parts of the International Arrivals Building at Kennedy, the Central Terminal Building at La Guardia, and the North Terminal Building at Newark. Initially, ISKCON challenged restrictions on sankirtan in both leased and unleased portions of the airports, but after a series of legal skirmishes over the need to join various commercial airlines as defendants and, once joined, over their status as state actors, the portion of the litigation involving the airlines was settled. The instant appeal thus pertains only to those unleased portions of Kennedy, La Guardia and Newark--to which we refer for convenience as "terminals"--subject to the Port Authority's direct control.
 
 
 6
 The public has access to the terminals, which contain various commercial establishments. At the time of ISKCON's submissions to the district court on the summary judgment motion, for example, the lobby of the International Arrivals Building at Kennedy included two restaurants, two snack stands, a bar, a postal substation and postal facility, a bank, a telegraph office, a duty-free boutique, a drug store, a nursery, a barber shop, two currency exchange facilities, a dental office, and an area for the display of art exhibits. Along the east and west corridors of that same building were some ten duty-free shops, five bars, two snack stands, a telegraph office, two bookstores, two newsstands, a bank, four travel insurance facilities, two currency exchanges, two cookie and candy shops, a cash and traveler's check machine, an India store, and a boutique-sized Bloomingdale's. Similar establishments lined the lobbies and corridors of both the Central Terminal Building at La Guardia and the North Terminal Building at Newark.
 
 
 7
 Although these areas are open to the public, virtually everyone who enters the terminal does so for a purpose related to air travel. These include travelers, persons meeting or seeing off passengers, members of flight crews, and employees of the terminal, an airline or a business in the terminal.
 
 
 8
 The Port Authority has promulgated a regulation forbidding both the solicitation of money and the repetitive distribution of literature within such areas. That regulation, which effectively prohibits ISKCON from performing sankirtan,[2] states in pertinent part:
 
 
 9
 1. The following conduct is prohibited within the interior areas of buildings or structures at an air terminal if conducted by a person to or with passers-by in a continuous or repetitive manner:
 
 
 10
 (a) The sale or distribution of any merchandise, including but not limited to, jewelry, food stuffs, candles, flowers, badges and clothing.
 
 
 11
 (b) The sale or distribution of flyers, brochures, pamphlets, books or any other printed or written material.
 
 
 12
 (c) The solicitation and receipt of funds.
 
 
 13
 ISKCON moved for summary judgment on the ground that the airport terminals are traditional public fora for expressive activity and that the Port Authority's regulation thus violates the First Amendment. The district court granted ISKCON's motion, whereupon the Port Authority, in Mr. Lee's name, appealed.
 
 DISCUSSION
 
 14
 The Port Authority does not dispute that ISKCON'S in-person solicitation of contributions and distribution of religious literature are protected speech within the meaning of the First Amendment. See Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981). The issue here is whether the terminals at Kennedy, La Guardia and Newark are traditional fora for ISKCON's concededly protected activities. Because the terminals are open to the public, heavily traveled and contain a wide array of commercial establishments, the district court concluded that they are akin to public sidewalks and, based on that conclusion and our decision in Wolin v. Port of New York Authority, 392 F.2d 83 (2d Cir.), cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968),[3] struck down the Port Authority's regulation.
 
 
 15
 Public forum analysis is derived from the axiom that "[e]ven protected speech is not equally permissible in all places and at all times." Cornelius v. NAACP Legal Defense and Educational Fund, Inc., 473 U.S. 788, 799, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985). In determining whether a particular restriction on protected speech is permissible, the Supreme Court has "often focused on the 'place' of that speech, considering the nature of the forum the speaker seeks to employ." Frisby v. Schultz, 487 U.S. 474, 479, 108 S.Ct. 2495, 2499, 101 L.Ed.2d 420 (1988). Restrictions on identical kinds of speech may be struck down or upheld "depending on the character of the property at issue." Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).
 
 
 16
 In recent years, the Supreme Court has classified government-owned property into three categories--"the traditional public forum, the public forum created by government designation, and the nonpublic forum." Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449. Traditional public fora are places that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). Public streets, sidewalks and public parks are paradigmatic examples of such fora, although streets through military bases, see Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), are a noteworthy exception.
 
 
 17
 Designated public fora are areas not traditionally open to assembly and debate that the pertinent governmental authorities have intentionally opened for public discourse. See Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449. Nonpublic fora lack the characteristics of traditional public fora and have not been acknowledged by the pertinent governmental authority as consistent with expressive activity. Speakers may be excluded from traditional or designated public fora "only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." Id. at 800, 105 S.Ct. at 3448. In traditional and designated public fora, therefore, the government may impose only reasonable time, place and manner restrictions unless there is a compelling state interest. By contrast, restrictions on speech are permissible in nonpublic fora so long as they are reasonable and viewpoint-neutral. See Perry Education Ass'n, 460 U.S. at 49 & n. 9, 103 S.Ct. at 957 & n. 9. The Court's three-tiered framework, with its focus on the purposes and attributes of the forum rather than the speaker's desired audience, see supra note 3, has become the governing paradigm where, as here, a court must ascertain whether to apply strict scrutiny or some less demanding standard.
 
 
 18
 ISKCON does not argue that the Port Authority has designated its airport terminals as public fora for expressive activity. This case thus differs from Jamison v. City of St. Louis, 828 F.2d 1280, 1283 (8th Cir.1987), cert. denied, 485 U.S. 987, 108 S.Ct. 1289, 99 L.Ed.2d 499 (1988), in which the Eighth Circuit held that the City's terminals were traditional public fora but also emphasized that "[t]he City's regulations ... implicitly acknowledged that the first amendment activities that take place in more traditional public forums are not incompatible with the purposes of an airport's public concourses." In the instant matter, the Port Authority has not conceded, by regulation or otherwise, that expressive activities are consistent with its operation of Kennedy, La Guardia and Newark. The sole issue on appeal, therefore, is whether the terminal areas are traditional public fora for protected speech.
 
 
 19
 Neither the Supreme Court nor this circuit has ever addressed the issue of where airline terminals fit in public forum analysis. The "well-established" authority in other circuits, see Fernandes v. Limmer, 663 F.2d 619, 626 (5th Cir. Unit A Dec.1981), is that airport terminals are traditional public fora for speech activities. See, e.g., Jamison, supra; Jews for Jesus, Inc. v. Board of Airport Commissioners, 785 F.2d 791, 793-95 (9th Cir.1986), aff'd on other grounds, 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987). Prior to the decision in Kokinda, this panel was prepared to follow the authority established in other circuits. To hold otherwise would have created a conflict among the circuits over an issue that the Supreme Court has declined to address despite numerous opportunities. Where there is the considerable weight of unanimous authority, we believe that creation of such a circuit conflict must be baned on an abiding conviction that the view of several other courts is unreasonable, lest the Supreme Court's ability to resolve conflicts among the circuits be impaired by the sheer number of such conflicts. We believe, however, that Kokinda has altered public forum analysis and that we would not be faithful to Supreme Court precedent if we were to follow the other circuits.
 
 
 20
 Until Kokinda, and with the exception of Greer, the Court's decisions treated streets and sidewalks as traditional public fora without engaging in any detailed analysis of their particular purposes. In Frisby v. Schultz, supra, for example, the Court held that a public street does not lose its status as a traditional public forum simply because it runs through a residential neighborhood. The Frisby Court explained that "[n]o particularized inquiry into the precise nature of a specific street is necessary" because "all public streets are held in the public trust and are properly considered traditional public fora." 487 U.S. at 481, 108 S.Ct. at 2500 (emphasis added). Given this approach, the district court's reliance on the visual and other similarities between the terminals' passageways and a "bustling metropolitan boulevard" was understandable.
 
 
 21
 Kokinda involved a free-standing post office with its own sidewalk and parking lot. The sidewalk was neither connected to any pedestrian thoroughfare nor used for any purpose other than negotiating the space between the post office and parking lot. 110 S.Ct. at 3118. At issue was a Postal Service regulation prohibiting the in-person solicitation of money on postal premises. Id. Four members of the Court concluded that the sidewalk was a nonpublic forum and thus applied the reasonableness test of Cornelius. Writing for the four, Justice O'Connor stated that the sidewalk was not a public passageway designed "to facilitate the daily commerce and life of the neighborhood or city" but was intended "solely to assist postal patrons" to get access to postal services. Id. 110 S.Ct. at 3120. She further agreed with the Postal Service that the in-person solicitation of funds is "inherently disruptive of the postal service's business" and "impedes the normal flow of traffic." Id. at 3123. In particular, she noted that such solicitation "requires action by those who would respond" and is to be distinguished from the distribution of literature that may be taken without pause to be read later. Id.
 
 
 22
 Justice Kennedy, who wrote separately, did not reach the question of whether the sidewalk was a traditional public or nonpublic forum. However, he voted to uphold the regulation as an appropriate time, place and manner restriction on the ground that the government has "a significant interest in protecting the integrity of the purposes to which it has dedicated the property, that is, facilitating its customers' postal transactions." 110 S.Ct. at 3126. His agreement with the plurality was thus limited to the view that the in-person solicitation of funds is disruptive of postal transactions. He noted, however, his belief that other, less disruptive forms of expressive activity, such as leafletting, should be permitted on the sidewalk. Id.
 
 
 23
 Notwithstanding the different rationales employed by the plurality and Justice Kennedy, Kokinda dictates reversal of the judgment in the instant action insofar as it invalidates the Port Authority's regulation prohibiting in-person solicitation of funds in the terminals of the three airports. A majority held in Kokinda that in-person solicitation of money on the post office sidewalk could be prohibited without violating the First Amendment. Like the sidewalk in Kokinda, the Port Authority's terminals are remote from pedestrian thoroughfares and are intended solely to facilitate a particular type of transaction--air travel--unrelated to protected expression. Persons using the passageways in terminals are not there primarily to meet a friend for lunch, windowshop, take the air, or engage in any of the multitude of other purposes for which typical downtown streets are used. They are there solely as air travelers, persons connected with air travelers, or employees of businesses serving air travelers.
 
 
 24
 The Port Authority's anti-solicitation restriction serves precisely the same purpose as did the restriction upheld in Kokinda. Kennedy, La Guardia and Newark are funded by user fees and operated so as to make a regulated profit. Just as the Postal Service in Kokinda had a significant interest in protecting users of the branch office from the in-person solicitation of funds, the Port Authority has an interest in protecting its airport patrons from the identical disruption of in-person solicitation. It is true that the various commercial establishments and art exhibits at the three airports create an appearance similar to a busy downtown street. It is also true, however, that the facilities in question exist solely to accommodate the needs of air travelers, just as the post office and sidewalk in Kokinda existed solely to facilitate the use of postal services.
 
 
 25
 Given the possibility of further review, we take care to detail our understanding of Kokinda. We read the plurality opinion of Justice O'Connor to distinguish between passageways or other facilities that exist solely to facilitate the public's carrying on of a particular endeavor--subway or air travel for example--and passageways or facilities that enable the public to carry out the multitude of purposes persons pursue in their daily life--the typical Main Street. The former are non-public fora, and government may prohibit the in-person solicitation of funds at least where those using the passageway or facility might be disrupted by such solicitation. Passageways or facilities used solely for a particular purpose are of course among society's choke-points and thus particularly useful to those seeking to solicit funds. However, where the particular purpose is such that the public uses them as a matter of necessity, or at least great convenience, we read the plurality opinion to allow the prohibition of in-person solicitation of funds to prevent disruption of that public. Justice Kennedy reaches the same result because he believes that a prohibition on the in-person solicitation of funds is a legitimate time, place and manner restriction.
 
 
 26
 The Port Authority's concern over disruption of the air-traveling public is justified on the present record. That record establishes that pedestrian congestion is one of the greatest problems facing the three terminals. Much of the facilities in question was built before wide-body aircraft, and a pressing need for expansion exists. Air travelers, who are often weighted down by cumbersome baggage and may be hurrying to catch a plane or to arrange ground transportation, will find in-person solicitation even more disruptive than did the postal patrons in Kokinda. We are thus unable to distinguish that case.
 
 
 27
 With regard to the Port Authority's ban on the distribution of literature, we read Kokinda as looking in a different direction. The four dissenting justices believed the sidewalk to be a public forum and additionally indicated that they perceived no relevant distinction between the in-person solicitation of funds and the distribution of leaflets. See 110 S.Ct. at 3126-39. They would therefore allow the latter in the air terminals in question. So too, we believe, would Justice Kennedy, whose concurring opinion stressed the need "to protect public places where traditional modes of speech and forms of expression can take place." 110 S.Ct. at 3125. Justice Kennedy relied entirely upon the distinction between the disruptive effect of the in-person solicitation of funds and the lesser inconvenience of the distribution of literature in upholding the Postal Service regulation and did not reach the public/nonpublic forum issue. We thus count him as having adopted a view that would permit the distribution of literature in the instant matter. We also note that the four justices who considered the post office sidewalk to be a nonpublic forum also relied in part on the distinction between in-person solicitation and leafletting in upholding the regulation. See 110 S.Ct. at 3123-24. There was thus at least a majority, and perhaps more, that would allow the latter. We therefore hold that the Port Authority must provide reasonable access to the terminals for the distribution of literature.
 
 
 28
 Affirmed in part, reversed in part.
 
 OAKES, Chief Judge, dissenting:
 
 29
 At issue in this case is whether the terminal areas controlled by the Port Authority at Kennedy, LaGuardia and Newark airports are traditional public fora, such that the Port Authority's regulation against leafletting and solicitation must be examined under the strict scrutiny standard articulated in Perry Ed. Ass'n v. Local Educators' Ass'n, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), and its progeny. Although this issue has remained open until today in this Circuit, two of our sister Circuits have recognized that airport terminals are traditional public fora. See Jamison v. City of St. Louis, 828 F.2d 1280, 1282-84 (8th Cir.1987), cert. denied, 485 U.S. 987, 108 S.Ct. 1289, 99 L.Ed.2d 499 (1988); Jews for Jesus, Inc. v. Board of Airport Comm'rs, 785 F.2d 791, 793-95 (9th Cir.1986), aff'd on other grounds, 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987). In addition, at least three other Circuits have recognized airport terminals as generic "public fora," without distinguishing whether they are of the traditional or designated category. See United States Southwest Africa/Namibia Trade & Cultural Council v. United States, 708 F.2d 760, 763-68 (D.C.Cir.1983); Fernandes v. Limmer, 663 F.2d 619, 626-27 (5th Cir. Unit A. Dec.1981); Chicago Area Military Project v. City of Chicago, 508 F.2d 921 (7th Cir.), cert. denied, 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975); see also Gannett Satellite Information Network v. Berger, 716 F.Supp. 140, 149 (D.N.J.1989) ("Newark Airport is a public forum."), aff'd in part & rev'd in part, 894 F.2d 61 (3d Cir.1990). But see International Caucus of Labor Comms. v. Metropolitan Dade County, 724 F.Supp. 917, 923 (S.D.Fla.1989) (Miami International Airport terminal not a traditional public forum). Moreover, we have previously noted in dicta that Krishna devotees practice sankirtan in "various public forums--airports, bus stations, state fairs," International Soc'y for Krishna Consciousness v. Barber, 650 F.2d 430, 434 (2d Cir.1981), and have held that the Port Authority's bus terminal in New York City is a "public forum." See Wolin v. Port of New York Auth., 392 F.2d 83, 88-91 (2d Cir.), cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968).[1]
 
 
 30
 Against this backdrop of authority, the majority acknowledges that before the Supreme Court's recent plurality opinion in United States v. Kokinda, --- U.S. ----, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), it was prepared to hold that the Port Authority's airport terminals were traditional public fora. However, the majority believes that Kokinda has "altered" the Supreme Court's public forum analysis, which it claims now must focus on the distinction between "passageways or other facilities that exist solely to facilitate the public's carrying on of a particular endeavor and [those] that enable the public to carry out the multitude of purposes persons pursue in their daily life." Supra. While the latter may be traditional public fora, the majority finds that Kokinda stands for the proposition that the former are categorically not public fora. Because I disagree with this assessment, and instead believe that Kokinda is neither controlling nor a substantial deviation from the Court's public forum analysis, I respectfully dissent.
 
 
 31
 Generally, traditional public fora include locations such as streets and public parks, "clearly held in trust, either by tradition or recent convention, for the use of citizens at large," where discussions of public questions might ordinarily take place. Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 815 n. 32, 104 S.Ct. 2118, 2134 n. 32, 80 L.Ed.2d 772 (1984); see also Perry, 460 U.S. at 45, 103 S.Ct. at 954. But the physical characteristics of a forum do not necessarily determine traditional public forum status. See Kokinda, 110 S.Ct. at 3120 ("The mere physical characteristics of the property cannot dictate forum analysis."). Even a public street, for example, may not be a traditional public forum along that portion that runs within the confines of a military base. See Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (military reservation, including public street running through it, not traditional public forum). Nor does unlimited public access to a forum necessitate a finding that it is a traditional public forum. See id. at 836, 96 S.Ct. at 1216.
 
 
 32
 Similarly, the purposes for which a forum is designed and to which it is put are not alone determinative of its status. Certainly, the purposes of a forum are highly relevant to the traditional public forum inquiry. In Greer, for example, the exigent national security purposes of a military post weighed heavily in favor of the Supreme Court's finding that the Fort Dix Military Reservation is not a traditional public forum. See 424 U.S. at 837-38, 96 S.Ct. at 1217-18. However, this observation does not compel what I believe is the majority's simplistic conclusion that a forum's purpose can alone dictate its status. Virtually all Government-owned property has an ostensible "purpose" other than the promotion of free speech, assembly, and debate. It can scarcely be argued that the Government builds streets, which are ordinarily traditional public fora, for the primary purpose of fostering First Amendment activities. At least, the Supreme Court does not think it can be. See Schneider v. State, 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939) ("Municipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for movement of people and property, the primary purpose to which the streets are dedicated.") (emphasis added); see also Wolin, 392 F.2d at 89 (acknowledging that Port Authority bus terminal is "designed for precisely the purpose of transit," but nevertheless finding it to be a public forum).
 
 
 33
 Further undermining the argument that purpose alone is determinative of a forum's status are the Supreme Court's numerous decisions holding that some governmental fora that serve no purpose other than communication of ideas are nevertheless not traditional public fora. See Cornelius v. NAACP Legal Defense and Education Fund, 473 U.S. 788, 804, 105 S.Ct. 3439, 3450, 87 L.Ed.2d 567 (1985) (federal charity fundraising drive); Perry, 460 U.S. at 46, 103 S.Ct. at 955 (school district's internal mail system); United States Postal Serv. v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 132, 101 S.Ct. 2676, 2686, 69 L.Ed.2d 517 (1981) (residential mailboxes); Lehman v. City of Shaker Heights, 418 U.S. 298, 302-04, 94 S.Ct. 2714, 2716-18, 41 L.Ed.2d 770 (1974) (plurality opinion) (advertising space inside city buses).
 
 
 34
 Nor do I think that the Supreme Court's recent decision in United States v. Kokinda, --- U.S. ----, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), announces a new rule that changes a forum's purpose from being an important factor in public forum analysis to being the sole determinant of a forum's status. At the start, it must be emphasized that Kokinda is of questionable precedential value, in that only four Justices agreed that the post office sidewalk at issue was not a traditional public forum. The fifth Justice who cast his vote in favor of the plurality's result agreed that the regulation at issue was a reasonable time, place, and manner restriction, and conceded that "there remains a powerful argument that, because of the wide range of activities that the Government permits to take place on this postal sidewalk, it is more than a nonpublic forum." See id. 110 S.Ct. at 3125 (Kennedy, J., concurring).
 
 
 35
 Moreover, even reading Kokinda as controlling, there is no basis to conclude from the plurality's opinion that a forum's purpose will, ipso facto, illuminate its status. In concluding that the postal sidewalk was not a traditional public forum, Justice O'Connor assessed not only the postal sidewalk's purpose, but also its location, see id. 3121, the degree of public access afforded by the sidewalk, see id. at 3120, and whether such sidewalks had " 'traditionally served as a place for free public assembly and communication of thoughts by private citizens.' " Id. at 3121 (quoting Greer, 424 U.S. at 838, 96 S.Ct. at 1217). In fact, it is the latter inquiry that Justice O'Connor concluded "has illuminated our traditional public forum analysis, and that we apply today." Id. This pivotal language demonstrates that the majority is simply wrong in concluding that Kokinda stands for the immutable proposition that facilities that exist solely for the "public's carrying on of a particular endeavor ... are nonpublic fora."
 
 
 36
 In short, I believe that Kokinda reaffirms the basic proposition that traditional public forum status does not turn on any single factor or characteristic. Rather, a more complex balancing determination is necessary, in which it must be determined whether "the character of the place, the pattern of usual activity, the nature of its essential purpose and the population who take advantage of the general invitation extended make it an appropriate place for communication of views on issues of political and social significance." Wolin v. Port of New York Auth., 392 F.2d 83, 89 (2d Cir.), cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968); see also Fernandes, 663 F.2d at 626 (adopting Wolin's factors for determining public forum status). In other words, we balance the governmental purposes of the forum on the one hand against the tradition of public access to that forum, and the interests of those who wish to use the forum for another purpose, on the other hand. See Cornelius, 473 U.S. at 800, 105 S.Ct. at 3448.[2]
 
 
 37
 Employing this balancing test, I would agree with the district court that the airport terminals at issue are traditional public fora. For the reasons set forth below, I see no meaningful distinction, in terms of the balance between the public's tradition and interest in access and the governmental interest in controlling its property, between airport terminals and ordinary public streets or sidewalks. Both airport terminals as well as public streets and sidewalks are generally accessible to the public, available and appropriate at all times for discussion of public questions. See Jamison, 828 F.2d at 1283 ("[A]n airport terminal is much like a busy city street. Both are lined by shops, restaurants, newsstands, and other businesses, with travelers or other members of the general public coming and going as they please."); United States Southwest Africa/Namibia, 708 F.2d at 764 ("[I]t seems clear that the public places in these airports are far more akin to such public forums as streets and common areas than they are to such nonforums as prisons, buses, and military bases."); Fernandes, 663 F.2d at 627 (noting "lack of restrictions on entry by the general public, and the commercial, street-like character of the terminal concourses"). In fact, it is conceded that the terminal areas at Kennedy, LaGuardia and Newark contain restaurants, post offices, banks, drug stores, and many other commercial establishments that one would normally expect to encounter on the main thoroughfare of any town in America. The Government's interest in controlling movement and traffic in both fora, while substantial, is no greater in the context of an airport terminal complex than in the context of the public roadway system. Accordingly, I see no greater incompatibility between governmental interests and free-speech interests on an ordinary public street than in the general circulation areas of New York's major airport terminals.
 
 
 38
 Nonetheless, the Port Authority contends that airport terminals differ from traditional public fora such as streets, sidewalks, or parks in five different ways: their unique design and usage, their congestion problems, their security problems, their specialized user-fee financing, and the presence of captive audiences. I consider each of these in turn and find none of them individually or collectively persuasive.
 
 
 39
 Airport terminals and streets or sidewalks alike are designed and used for the efficient movement of travelers. I see no distinction between the amount of planning going into the design of airport passenger terminals compared to our modern urban roadway systems. Both are used for the same purposes--transportation--and I do not see how we can attach any constitutional significance to the fact that one involves travel by airplane and the other by automobile.
 
 
 40
 The Port Authority puts particular weight on the fact that airport terminals are designed to be geographically isolated from other parts of the community.[3] Indeed, the Kokinda plurality emphasized the separation of a post office sidewalk by a parking lot from other municipal sidewalks as an important factor in determining that the post office sidewalk at issue was not a traditional public forum. See Kokinda, 110 S.Ct. at 3121 ("[T]he location and purpose of a publicly-owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum.") (emphasis added). However, as stated above, Kokinda is of questionable precedential value. Moreover, I am considerably less than certain that if the post office building in Kokinda had also included the vast array of shops, restaurants, and service centers characteristic of Kennedy, LaGuardia, and Newark Airports that even four Justices would have found that the sidewalk outside was not a traditional public forum. "The Postal Service [had] not ... open[ed] postal sidewalks to any First Amendment activity." Id. at 3121. The Port Authority, by contrast, has invited and welcomed extensive expressive activity within its airport terminals.
 
 
 41
 I thus think the physical isolation of a forum is relevant only in light of the reasons for its isolation. Only when the Government isolates a particular forum for the purpose of regulating public access does location emerge as a relevant factor in favor of denying public forum status. So, for example, the isolation or separation of a military base from the surrounding community in order to discourage prying eyes would render location highly relevant to the public forum inquiry. Where physical isolation of a forum is the product of happenstance or for functional purposes unrelated to regulation of public access, location becomes far less relevant. It is obvious why airport terminals are isolated and separated from the buildings and skyscrapers of downtown Manhattan and to a certain extent from quiet residential areas. The isolation--if it can be called that--of airports from other parts of the community is in deference to the physics and audiophonics of aviation and not to any notion that the movement of people and ideas should be restricted. This physical separation does not imply that the airport is any less socially integrated into the everyday flow of people and ideas around the New York metropolitan region. To the contrary, few are the places where one can meet so many persons from diverse parts of the New York metropolitan area as inside its airport terminals.
 
 
 42
 As for problems of congestion, public streets and sidewalks no less than airport terminals are subject to tremendous traffic problems all over the New York metropolitan area. New Yorkers and others who have had the misfortune of trying to fly out of one of the New York airports during rush hour have discovered the hard way that the greatest risk of missing their flight might well come from the delay of traffic on public streets leading to the airport rather than from the crowds of people circulating within the airport terminals. Moreover, congestion might well weigh in favor of finding the airport to be a traditional public forum. The airport terminals are "an appropriate place for expressing one's view precisely because the primary activity for which [they are] designed is attended with noisy crowds ... some unrest and less than perfect order." Wolin, 392 F.2d at 90 (footnote omitted). I am confident that if the Port Authority can withstand the inefficiencies of movement occasioned by travelers' stopping to visit the numerous vendors and boutiques lining the terminal's corridors (and from which the Port Authority, of course, derives revenue), it can also tolerate at least some inconveniences attendant upon the exercise of plaintiffs' fundamental First Amendment freedoms.
 
 
 43
 Similarly, security problems are of equal concern on public streets as in airport terminals, even if security problems on the streets are more innocuously labeled as "crime" rather than "terrorism." No one would seriously contend that streets located in dangerous city neighborhoods are not traditional public fora by virtue of the Government's greater need to promote public safety in these areas. The Port Authority no doubt has a powerful interest in maintaining security at its airports. But these concerns are redressable through reasonable time, place, and manner restrictions regulating access to secured areas.
 
 
 44
 The specialized financing of airports through user-fees, rather than general tax revenue, has no relevance to whether the terminals are traditional public fora. Many streets are also financed by user-fees, e.g., by tolls or by subdivision exactions. By contrast, the top secret areas of military bases, which no one would argue are traditional public fora, are financed by general tax revenues.
 
 
 45
 Finally, the Port Authority's fear that travelers are a "captive audience" at the mercy of the Krishnas is not well-founded. The Krishnas seek access to persons only in general circulation areas and not check-in areas or baggage claim areas. On these facts, the Constitution requires those who are offended by the Krishnas to "avoid further bombardment of their sensibilities ... by averting their eyes." Cohen v. California, 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971).
 
 
 46
 In light of my conclusion that the airport terminals are traditional public fora, it follows that the Port Authority may not impose a complete prohibition on First Amendment activities absent a compelling governmental interest. I would find no such interest here. Accordingly, the Port Authority's virtual blanket prohibition on First Amendment activities inside the terminal areas it controls cannot be upheld. This much even the majority concedes insofar as leafletting is concerned.
 
 
 47
 It is of course true that the Port Authority may promulgate reasonable content-neutral time, place, and manner restrictions narrowly tailored to serve a significant governmental interest and permitting alternative channels for communication. See Perry, 460 U.S. at 45, 103 S.Ct. at 955. I have no doubt that the Port Authority's interest in expediting the movement and safety of travelers is significant. See Heffron v. International Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 654, 101 S.Ct. 2559, 2567, 69 L.Ed.2d 298 (1981); Fernandes, 663 F.2d at 626; Wolin, 392 F.2d at 93. Therefore, I may well be persuaded that reasonable time, place, and manner regulations that, for example, require permits or badges for solicitors, or that limit the number of solicitors permitted, or that restrict the locations within the terminal buildings where solicitors may conduct their activities would pass constitutional scrutiny. See, e.g., Heffron (upholding limitation on Krishna solicitation at state fair to stationary booths); International Soc'y for Krishna Consciousness v. Rochford, 585 F.2d 263, 268-69 (7th Cir.1978) (upholding restrictions on locations of First Amendment activities within airport); Wolin, 392 F.2d at 94 ("[T]he Port Authority may set approximate and reasonable limitations on the number of persons who may engage in such activities at any specific time, the duration of the activity and the specific places within the building where the rights of expression may be exercised."). However, a complete prohibition of First Amendment activity--such as the Port Authority's regulation--is, in my mind, not a narrowly drawn regulation that allows for alternative channels of communication, and therefore not constitutionally permissible.
 
 
 48
 Finally, the distinction between leafletting and fund solicitation that the majority draws I find to be without a difference. Both involve the same congestion, the same irritation, if you will. And may the content of the leaflets permitted be proscribed? If not, will solicitation of funds by leaflet be permitted? If not, what may the leaflets say?
 
 
 49
 I would affirm the judgment of the district court.
 
 
 50
 On Petition for Rehearing and Suggestion for Rehearing In Banc
 
 April 25, 1991
 
 51
 A petition for rehearing containing a suggestion that the action be reheard in banc having been filed herein by counsel for the plaintiffs-appellees International Society for Krishna Consciousness, Inc., et al.,
 
 
 52
 Upon consideration by the panel that heard the appeal, it is
 
 
 53
 Ordered that said petition for rehearing is DENIED.
 
 
 54
 It is further noted that the suggestion for rehearing in banc having been transmitted to the judges of the Court in regular active service and to any other judge that heard the appeal and a poll of said judges having been taken, a majority of the Court has voted not to reconsider the decision in banc. Chief Judge Oakes dissents from the denial of the rehearing in banc in a separate opinion, in which Judges Newman and Cardamone concur.
 
 
 55
 OAKES, Chief Judge, with whom NEWMAN and CARDAMONE, Circuit Judges join, dissenting from denial of rehearing en banc:
 
 
 56
 I dissent from the denial of rehearing en banc for three reasons. First, rehearing is necessary to avoid a clear-cut conflict among the circuits, created by the panel's decision, as to whether airport terminals are traditional public fora. Compare International Soc'y for Krishna Consciousness, Inc. v. Lee, 925 F.2d 576 (2d Cir.1991) (finding that terminals are not traditional public fora) with Jamison v. City of St. Louis, 828 F.2d 1280 (8th Cir.1987) (finding that terminals are traditional public fora), cert. denied, 485 U.S. 987, 108 S.Ct. 1289, 99 L.Ed.2d 499 (1988); Jews for Jesus, Inc. v. Board of Airport Comm'rs, 785 F.2d 791 (9th Cir.1986) (same), aff'd on other grounds, 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987). See also United States Southwest Africa/Namibia Trade & Cultural Council v. United States, 708 F.2d 760 (D.C.Cir.1983) (finding that terminals are generic public fora, without distinguishing between the "traditional" or "designated" categories); Fernandes v. Limmer, 663 F.2d 619 (5th Cir. Unit A. Dec.1981) (same); Chicago Area Military Project v. City of Chicago, 508 F.2d 921 (7th Cir.) (same), cert. denied, 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975).
 
 
 57
 Second, rehearing is necessary to clarify our circuit's understanding of United States v. Kokinda, --- U.S. ---, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality decision), which the panel claims has "altered public fora analysis." Lee, 925 F.2d at 580. Given that only a plurality of the justices in Kokinda decided that the post office sidewalk there was not a traditional public forum, and did so without exclusive reliance on the sidewalk's purpose, see Lee, 925 F.2d at 584 (Oakes, C.J., dissenting), as well as the fact that an airport terminal is wholly different from a post office sidewalk, see id. at 584-87, I believe that the panel's reading of Kokinda will, at a minimum, constitute bad law for our circuit and, at most, have extremely deleterious consequences for future public fora jurisprudence.
 
 
 58
 Third, I would grant rehearing to reconcile the panel's conclusion that a forum's purpose alone can determine its public or non-public status, see Lee, 925 F.2d at 581-82, with our circuit's longstanding doctrine that the status of a forum is determined by a complex balancing of competing factors, none of which alone is dispositive. See Wolin v. Port of New York Auth., 392 F.2d 83, 89 (2d Cir.), cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968) (holding that a forum's status is determined by whether "the character of the place, the pattern of usual activity, the nature of its essential purpose and the population who take advantage of the general invitation extended make it an appropriate place for communication of views on issues of political and social significance").
 
 
 59
 I should suppose that rehearing en banc could be denied here on the basis that the Supreme Court is sure to grant certiorari. That, it strikes me, is not sound justification; better that our house be put in order without Supreme Court intervention.
 
 
 
 [1]
 The district court dismissed the Port Authority as a defendant in 1977 pursuant to Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973)
 
 
 [2]
 While the Port Authority concedes that sankirtan may be performed on the sidewalks outside its airports, ISKCON does not seek access to those areas. The district court thus concluded that the relevant forum for purposes of determining ISKCON's rights is the place to which ISKCON seeks access--namely, the interior portions of the airport terminals. See Cornelius v. NAACP Legal Defense and Educational Fund, 473 U.S. 788, 801, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985)
 
 
 [3]
 Wolin held that the Port Authority's bus terminal in New York City was an appropriate place for distributing leaflets, carrying placards and conducting antiwar discussions with passing pedestrians. We noted that the bus terminal was a place "where the relevant audience [for an antiwar protest] may be found." Id. at 90. Because Wolin's antiwar protest was aimed at both "the general public and ... a special audience--servicemen traveling to and from their bases, particularly buses arriving from Fort Dix"--we struck down the Port Authority's "plenary prohibition of speech" as violative of the First Amendment
 Id. at 90-91.
 The theory of Wolin would appear to protect the in-person solicitation of funds inside the bus terminal. Whether that result is still good law need not be decided. Wolin's rationale regarding the right to reach particular audiences seems undermined by the Supreme Court's analysis concerning traditional public fora, designated fora and nonpublic fora described two paragraphs infra in the text of this opinion and by, for reasons stated later in the text, Kokinda. However, the Port Authority bus terminal, or portions thereof, contains various commercial establishments that serve non-traveling pedestrians off adjoining streets, id. at 85, and is arguably like a public street. In contrast, commercial establishments in the air terminals at issue in the instant matter are not realistically used by persons not connected with air travel.
 
 
 [1]
 In Wolin, we did not specify whether the bus terminal was a traditional public forum or a designated public forum, as public forum analysis at that point in time had not yet given rise to the now-familiar tripartite distinction between traditional public fora, designated public fora, and non-public fora. Nevertheless, Wolin's analogy of the bus terminal to a public street, both with large crowds and stores and concessionaires, supports the proposition that under modern public forum analysis, the Port Authority bus terminal is a traditional public forum. See id. at 89
 
 
 [2]
 The public forum analytic framework has come under attack from many commentators, and even from four Supreme Court Justices, in part because it lends itself to mechanistic labeling of fora as public or non-public on the basis of their physical characteristics alone. See Kokinda, 110 S.Ct. at 3127 & n. 1 (Brennan, J., dissenting). Even if I agreed with the critics and wished to disregard public forum analysis, what the Supreme Court has adopted is not in my power to cast aside. Nevertheless, I see no necessary inconsistency between public forum analysis and a particularized balancing of First Amendment interests against governmental interests. See Greer v. Spock, 424 U.S. 828, 843, 96 S.Ct. 1211, 1220, 47 L.Ed.2d 505 (1976) (Powell, J., concurring). To put it differently, I view public forum analysis, properly applied, not as a device for inflexible categorization of governmental fora as public or non-public per se. Rather, public forum analysis is a useful shorthand method of evaluating the competing interests of individual speakers in exploiting important channels of communication, and of the Government in regulating the use of its own property. See L. Tribe, American Constitutional Law Sec. 12-24, at 987 (2d ed. 1988); Farber & Nowak, The Misleading Nature of Public Forum Analysis: Content and Context in First Amendment Adjudication, 70 Va.L.Rev. 1219, 1234-35 (1984)
 
 
 [3]
 Public highways, the Port Authority points out, isolate the airports from the surrounding communities. These highways, however, are most likely public fora. See Frisby v. Schultz, 487 U.S. 474, 481, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988) ("[A]ll public streets are held in the public trust and are properly considered traditional public fora."). It would be anomalous to conclude that the airport's separation from the rest of the community by highways, which are themselves concededly public fora, could weigh in favor of finding the airport terminals to be non-public fora